UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| WILLIAM HOADLEY | : | |
| | : | |
| v. | : | CIV. NO. 3:06CV00575 (JCH) |
| | : | |
| MICHAEL J. ASTRUE[1] | : | |
| COMMISSIONER, SOCIAL SECURITY | : | |
| ADMINISTRATION | : | |
| | : | |

RECOMMENDED RULING

This action, filed under §205(g) of the Social Security Act
("the Act"), 42 U.S.C. §405(g), as amended, seeks review of a
final decision of the Commissioner of Social Security ("the
Commissioner"), in which the ALJ found plaintiff was not entitled
to Social Security Disability Insurance Benefits ("DIB") under
§§216 and 223 of the Social Security Act (42 U.S.C. §§416 and
423) and to Supplemental Security Income Disability Benefits
(SSI) under §1631(c)(3) of the Social Security Act. (42 U.S.C.
§1383(c)(3)).

For the reasons that follow, plaintiff's Motion for Order
Reversing the Decision of the Commissioner [**Doc. #10**] is **DENIED**.
Defendant's Motion for Order Affirming the Decision of the
Commissioner [**Doc. #16**] is **GRANTED**.

---

[1] Michael J. Astrue became the Commissioner of Social
Security effective February 12, 2007. Pursuant to Rule 25(d)(1)
of the Federal Rules of Civil Procedure, Michael J. Astrue
should, therefore, be substituted for Commissioner Jo Anne
Barnhart as the defendant in this suit.

A. ADMINISTRATIVE PROCEEDINGS

Plaintiff filed an application for Disability Insurance
Benefits and Supplemental Security Income on September 18, 2003,
alleging disability beginning May 12, 2002, due to orthopedic
impairments. (Tr. 61-63, 15).[2]  His application was denied
initially on September 20, 2003, by the Commissioner, and on
reconsideration on February 21, 2004.

Upon plaintiff's timely request on April 19, 2004 (Tr. 40),
a hearing was held before Administrative Law Judge Roy Liberman
("ALJ"), on March 28, 2005.  Plaintiff, represented by counsel,
appeared and testified. (Tr. 520-43).  On April 5, 2005, the ALJ
issued a decision denying the claims.[3] (Tr. 5-7).

Plaintiff thereafter requested a review of the hearing
decision on April 29, 2005. (Tr. 11).  On February 14, 2006, the
Appeals Counsel denied plaintiff's request for review, making the
ALJ's decision the final decision of the Commissioner, subject to
judicial review. (Tr. 5-7).  On February 20, 2007, plaintiff
filed a motion seeking an order reversing the decision of the
Commissioner, or in the alternative, a remand for a new hearing.
[Doc. 10].  This case is now ripe for review under 42 U.S.C.

_____

[2]The administrative record filed by the Commissioner shall
be referred to as "Tr."

[3]ALJ's decision can be found in Tr. 12-20 but the date is
illegible. The Notice of Appeals Council Action  refers to the
ALJ's decision as "dated April 5, 2005." (Tr. 5).

§405(g).  Plaintiff is represented by counsel on this appeal.

B. <u>BACKGROUND</u>

    1. <u>Age, Education and Work Experience</u>

    Plaintiff was born August 9, 1956. (Tr. 61).  He was forty eight (48) years old on the date of his administrative hearing. (Tr. 16). Plaintiff has a high school equivalency diploma and past relevant work as a bus driver from August 1990 to May 2002 and as a prison guard.[4] (Tr. 526-27)

    2. <u>Medical Evidence</u>

    The medical record reveals that plaintiff was diagnosed by Jeffrey Pravda, M.D., an orthopedic surgeon, with an Acute T/S sprain on September 11, 1997, resulting from a lifting injury at work on August 23, 1997. (Tr. 104, 116).  After this injury, the plaintiff noticed "significant neck and right upper shoulder pain." (Tr. 104, 116).  Plaintiff described the pain as an eight (8) out of ten (10) at its worst and, at the time of the appointment, a five (5) out of ten (10). (Tr. 116).  Dr. Pravda's impression was of a bilateral rhomboid strain.[5] (Tr. 116). Plaintiff saw Dr. Pravda sixteen (16) times from September 11,

_____

    [4] No dates of plaintiff's employment as a prison guard were provided.  However, it is noted that plaintiff worked as a prison guard in California and Connecticut prior to working as a limousine driver. (Tr. 527).

    [5] Stedman's Medical Dictionary defines "rhomboid" as "denoting especially a ligament and two muscles." Stedman's Medical Dictionary 1361 (25th ed. 1990).

1997, to October 8, 2001, concerning this injury.

During this time, plaintiff was released to sedentary work or "light duty" from September 11 through September 18, 1997. (Tr. 104). Plaintiff was also placed in physical therapy. (Tr. 116). On September 18, 1997, Dr. Pravda further diagnosed plaintiff with a bilateral rhomboid strain and released him to "light duty" from September 18 through September 29, 1997, with specific restrictions.[6] (Tr. 105).

On September 29, 1997, Dr. Pravda noted that Mr. Hoadley "has noticed improvement" and "still has a back and rhomboid strain, but overall, they are better." (Tr. 118). Mr. Hoadley was then released to light duty from September 29 through October 5, 1997. Plaintiff remained in physical therapy. (Tr. 106, 118). Plaintiff was released to "full duty" on October 17, 1997, and reported working "with discomfort." (Tr. 107, 120). In November of 1997, Dr. Pravda ordered physical therapy to continue for three (3) weeks. (Tr. 109, 121).

On March 12, 1998, plaintiff was seen by Dr. Pravda, complaining that some shoulder pain had returned.[7] Dr. Pravda

---

[6] Such restrictions included no "overhead use or repetitive reaching," no "climbing/pulling/pushing," "no lifting over 20 lbs", and no "bending, scooping, or squatting." (Tr. 105).

[7] Specifically, the doctor noted that the plaintiff "had return of superolateral shoulder pain with some radiating discomfort down the lateral aspect of the arm.(Tr. 122). Furthermore, "he has good strength to resisted abduction and

noted that "overall, he has done well." (Tr. 122). Flexoril, a
muscle relaxant and Daypro were prescribed. (Tr. 122). On March
26, 1998, plaintiff was ordered to start physical therapy again.
(Tr. 111).

Due to continued discomfort and "a lot of impingement
symptoms," Dr. Pravda gave plaintiff a cortisone injection on
June 11, 1998. (Tr. 124). Plaintiff was given another cortisone
injection on September 17, 1998, when the pain returned. (Tr.
113, 125).

The medical record reveals that a consultation with Dr. Carl
Nissen, M.D., a shoulder specialist at U-Conn Medical Center, was
recommended by Dr. Pravda. (Tr. 126). Dr. Pravda also noted that
"at this point, . . . until he gets better posture and stronger
rhomboids, he is going to have a chronic and ongoing shoulder
problem." (Tr. 126).

Plaintiff was evaluated by Dr. Nissen, who suggested a
conservative program and referred him to Gaylord physical
therapy. (Tr. 129).

On October 14, 1999, almost a year after his last
appointment, Dr. Pravda evaluated plaintiff, due to complaints of

---

forward flexion. (Tr. 122). He has a mildly positive cross-
reach, mildly positive imingement sign. (Tr. 122). He has 165-
170 degrees of overhead reach. . . all the hallmarks of a mild
rhomboid and more significant impingement syndrome to the
shoulder." (Tr. 122).

returning symptoms, "mostly about the left shoulder." (Tr. 129).[8]
At this point, plaintiff requested an MRI to look for a rotator
cuff tear/rotator cuff impingement and tendinitis. (Tr. 129). A
subsequent MRI of plaintiff's left shoulder revealed that there
was no evidence of rotator cuff tear or tendinopathy. (Tr. 128).

Plaintiff visited Dr. Pravda again in March of 2000,
complaining of persisting shoulder pain. Specifically, plaintiff
alleged he had impingement type symptoms, such as difficulty
lifting, doing overhead activities, and lateral pain from the
acromion[9] towards the elbow. (Tr. 130). Dr. Pravda told
plaintiff he could either "consider a final disability
determination for his work-related shoulder injury," or "the
alternative would be to go back to see Dr. Nissen with his MRI,
to see if Dr. Nissen is willing to offer him an arthroscopy and
consideration of decompression." (Tr. 130).

Plaintiff requested a disability determination for his
shoulder from Dr. Pravda on June 16, 2000. (Tr. 131). Dr. Pravda
determined plaintiff had reached maximum medical improvement and

---

[8] Dr. Pravda also repeated x-rays, which were found to be
benign. It is further noted that upon examination, Dr. Pravda
determined plaintiff "has excellent strength, good forward
flexion, no winging, good shoulder shrug, positive cross-reach
and positive impingement sign." (Tr. 129).

[9]"Acromial process" is "the lateral end of the spine of the
scapula which projects as a broad flattened process overhanging
the glenoid fossa; it articulates with the clavicle and gives
attachment to part of the deltoid and of the trapezius muscles."
Stedman's Medical Dictionary 19 (25th ed.1990).

"[had] a five percent (5%) disability to his [left] shoulder,[10] based on persistent and ongoing discomfort." (Tr. 131).

On October 8, 2001, plaintiff saw Dr. Pravda again about his left shoulder. Plaintiff complained of pain radiating from the posterior aspect of the shoulder down the lateral aspect of the arm to the little finger of his left hand and associated tingling.[11] X-rays of the cervical spine proved fairly benign with slight degeneration at the C1-C2 junction. There was no evidence of spondylolisthesis.[12] (Tr. 132). Plaintiff was kept on full duty and started on a physical therapy program. (Tr. 132).

A treatment note written by Dr. Pravda on January 3, 2002,

---

[10] Treatment notes do not specify for which shoulder (i.e. right or left) the disability determination was requested. However, as Dr. Pravda referred to a singular shoulder and as plaintiff was previously complaining of left shoulder pain, it is assumed the disability determination is for plaintiff's left shoulder.

[11] Examination showed full range of motion about the neck; preserved strength, including resisted abduction and forward flexion to the shoulder, good flexion and extension to the elbow, dorsiflexion and plantarflexion to the wrist; neurologically intact to light touch and pinwheel testing; mildly depressed biceps reflex, good triceps and brachioradialis. (Tr. 132) There is no definition of "brachioradialis" in Stedman's Medical Dictionary, but it defines "brachio" as "arm," and "radialis" as "relating to the radius (bone of the forearm), to any structures named from it, or to the radial or lateral aspect of the upper limb . . . ." Stedman's Medical Dictionary 207, 1307 (25th ed. 1990).

[12] "Spondylolisthesis" is "forward movement of the body of one of the lower lumbar vertebrae on the vertebra, below it, or upon the sacrum." Stedman's Medical Dictionary 1456 (25th ed. 1990).

indicates that on December 27, 2001, plaintiff injured himself at work, straining the right side of his neck while transferring suitcases. (Tr. 133). Plaintiff was initially seen at the Veterans' Administration Hospital ("VA Hospital"), where he was placed on muscle relaxant, pain medicine and an anti-inflammatory. Plaintiff was taken out of work. (Tr. 133). He saw Dr. Pravda on January 3, 2002.[13] Dr. Pravda diagnosed the injury as a rhomboid strain and mild cervical radiculitis.[14] Plaintiff was released to desk duty and started a physical therapy program. (Tr. 133). It is noted that plaintiff was said to be capable of light duty, but that he should not drive. (Tr. 133).

Plaintiff met with Dr. Pravda six (6) times between January 3 and June 10, 2002, due to complaints of shoulder and neck pain resulting from his second injury in December of 2001.[15] (Tr. 133-

---

[13] Examination by Dr. Pravda revealed that plaintiff complained of mostly right-sided trapezius discomfort with radiating discomfort down his right arm. Examination showed preserved strength and sensation, diminished reflexes in the biceps, triceps and brachioradialis bilaterally; ability to forward flex chin-on-chest, extend thirty (30) degrees. Hyperextension and rotation caused some mild symptoms as did the extremes of rotation. (Tr. 133).

[14] "Radiculitis" is "inflammation of the intradural portion of the spinal nerve root prior to its entrance into the intervertebral foramen or of the portion between that foramen and the nerve plexus." Stedman's Medical Dictionary 1308 (25th ed. 1990).

[15] Plaintiff's complaints included bilateral shoulder pain, mild pain over AC joint, symptomatic cross-reach and pain at extremes of rotation, radiating discomfort down lateral aspect of

38, 141, 143). During this period, plaintiff continued physical
therapy. (Tr. 133-38, 141, 143). On January 17, 2002, plaintiff
was given a cortisone injection and released to "light duty" with
specific restrictions.[16] (Tr. 134). The medical record noted
that plaintiff was "doing much better."[17] (Tr. 135).

Plaintiff returned to "full duty" on February 25, 2002. (Tr.
136, 143). However, he was restricted to lifting up to fifteen
(15) lbs with his right arm. (Tr. 143). Treatment notes from
February, 21, 2002, note that plaintiff "may lift 75 lbs." (Tr.
144). Dr. Pravda saw plaintiff on March 14, 2002, and recorded
that "therapy had helped greatly."[18] (Tr. 136). The medical
record reveals that plaintiff complained of intermittent
discomfort on May 13, 2002, and of shoulder discomfort on June
10, 2002, at which point Dr. Pravda informed him that he did not
think continuing physical therapy would be beneficial. (Tr. 137,
138). Dr. Pravda again referred plaintiff to Dr. Nissen, a
shoulder specialist at U-Conn Medical Center. (Tr. 138).

On August 30, 2002, at plaintiff's own request, plaintiff

_____

arm, dropping things in right hand. (Tr. 134-35).

[16] Specific restrictions included no overhead use or
repetitive reaching with right arm, and no lifting over twenty
(20) lbs. (Tr. 141).

[17] Although not completely relieved, plaintiff was
neurologically intact, exhibited good strength, a full range of
motion, and a mildly symptomatic cross-reach. (Tr. 135).

[18] "Some mild symptoms" persisted, but patient exhibited a
"full range of motion and excellent strength." (Tr. 136).

was seen by Dr. John D. Kelley, M.D., at Connecticut Orthopaedic Specialists regarding his right shoulder. (Tr. 463). Dr. Kelley's impression was of chronic signs and symptoms of rotator cuff inflammation with a possibility of a full thickness tear. (Tr. 465).

An MRI of plaintiff's right shoulder on September 24, 2002, showed a small full thickness tear. (Tr. 466).

On October 4, 2002, plaintiff was seen again by Dr. Kelley, who discussed with him the potential risks and benefits of conservative versus surgical treatment for the small full thickness tear in his right shoulder. (Tr. 467).

On December 6, 2002, Dr. Kelley noted that plaintiff had made some improvement in physical therapy but was still having some pain at night. (Tr. 468). Dr. Kelley released him to light duty "where he does no lifting with the right arm and he does not do anything at or above shoulder level with the right upper extremity." (Tr. 468).

On February 28, 2003, plaintiff signed his consent for his right shoulder arthroscopy with rotator cuff repair by Dr. Kelley, (Tr. 469), who performed surgery on plaintiff's right shoulder on March 11, 2003. (Tr. 470-71).

Plaintiff had three (3) follow-up visits with Dr. Kelley on March 21, April 11, and May 9, 2003. (Tr. 472-74). Dr. Kelley noted improvement and continued progress in plaintiff's right

shoulder. (Tr. 472-74).

On June 6, 2003, Dr. Kelley released him to light duty with a limit of twenty-five (25) pounds of lifting and no lifting above shoulder level on the right side. (Tr. 475).

Records from July 11, 2003, note slow and steady progress. (Tr. 476).

On August 12, 2003, Dr. Kelley recorded that plaintiff was "doing well" and released him to full duty. (Tr. 477).

On August 26, 2003, plaintiff was seen by Dr. Edward M. Staub, M.D., about his chronic lower back pain. Dr. Staub had seen plaintiff in 1995, when plaintiff injured his back lifting suitcases. (Tr. 200). Dr. Staub's impression was of low back syndrome with right sciatica. He predicted a right-sided lumbar disc bulge. (Tr. 200). Dr. Staub noted that he did not think it would be feasible for plaintiff to return to a similar type job, but "he would be suitable for any number of light or sedentary type jobs." (Tr. 200).

Plaintiff was seen on August 27 and November 14, 2003, by Dr. Kelley , who noted further improvement in his right shoulder. (Tr. 478-79).

On January 12, 2004, Dr. Kenneth M. Krammer, M.D., saw plaintiff to offer a second opinion for Worker's Compensation for multiple lower back injuries. (Tr. 281-83). Treatment notes outline four incidents of lower back injuries, on August 12,

1995; August 23, 1997; January 23, 2001; and December 27, 2001.
(Tr. 281). After examination, Dr. Krammer recommended that
plaintiff remain on light duty restrictions. (Tr. 282). In
addition, Dr. Kramer recommended a trial of lumbar injections and
prescribed Soma. (Tr. 282-83).

On March 2, 2004, Dr. Kelley noted that, "I think
[plaintiff] has reached maximum medical improvement . . . he is
given a 4% permanent partial impairment of the upper extremity."
(Tr. 480). Plaintiff said that his shoulder had not been
bothering him. (Tr. 480).

Dr. Kramer's treatment notes on November 3, 2004, indicate
that plaintiff received right facet injections on October 21,
2004. (Tr. 458). Plaintiff reported one (1) week of improvement
and then subsequent return of the pain. Dr. Kramer prescribed a
trial of Neurontin. (Tr. 458).

On November 22, 2004, plaintiff was seen by Dr. Kramer and
reported ongoing frustration with his lower back pain. (Tr. 457).
Dr. Kramer determined that he should remain permanently on his
sedentary light work and look into Vocational Retraining. (Tr.
457).

Dr. Kramer saw plaintiff again on January 20, 2005.
Plaintiff reported that he found physical therapy helpful. (Tr.
455). Dr. Kramer increased plaintiff's prescription of Neurontin
and continued him on physical therapy. (Tr. 455).

Plaintiff saw Dr. Kramer again on February 17, 2005, alleging ongoing lower back pain, right thigh pain, and little improvement in physical therapy. Dr. Kramer stated, "my impression is of a chronically plateaued lumbar strain syndrome for which I do not find there to be any additional definitive formal treatment measures to recommend . . . ." (Tr. 454). Plaintiff was kept on sedentary restrictions. (Tr. 454).

On January 24, 2005, plaintiff was seen by Dr. Pravda, reporting ongoing complaints of left shoulder pain. Dr. Pravda reported that x-rays performed that day were benign and recommended an MRI scan. (Tr. 452-53). Plaintiff saw Dr. Pravda again on March 7, 2005, for follow-up of his left shoulder. Dr. Pravda noted essentially no change from plaintiff's last visit and recorded that he was waiting approval from plaintiff's insurance company with regards to an MRI of plaintiff's left shoulder. (Tr. 451).

3. Physical Therapy

Plaintiff attended physical therapy sessions for his right shoulder at Star Sports Therapy and Rehabilitation approximately forty-four (44) times from October of 2002 until May of 2003. (Tr. 145, 147-52, 154-56, 158, 159, 161-166, 168, 169, 172, 173, 175-80, 182-89, 191-97, 199). These physical therapy sessions were overseen by his physician, Dr. John D. Kelley, M.D. Plaintiff was initially evaluated on October 30, 2002, and

discharged to a home exercise program on December 12, 2002. (Tr. 145, 159). Plaintiff returned in February of 2003, complaining of constant pain, and was scheduled for surgery with Dr. Kelley in March of 2003. (Tr. 161).

On March 11, 2003, plaintiff underwent rotator cuff repair surgery. (Tr. 470-73). The record reveals that from March until May 16 of 2003, plaintiff attended physical therapy sessions, reporting a general trend of improvement with "no new complaints." Occasionally, plaintiff reported pain. (Tr. 175, 177-80, 182, 183, 185, 187, 188, 191-94, 196). On May 16, 2003, plaintiff was discharged by Dr. Kelley to a home exercise program. Dr. Kelley also referred plaintiff to the Temple Physical Therapy Work Hardening Program. (Tr. 198, 498).

Plaintiff attended physical therapy sessions at Temple Physical Therapy approximately forty-three (43) times between May and August, 2003. (Tr. 201, 212-20, 222-59). These physical therapy sessions were overseen by his physician, Dr. Kelley. Plaintiff was initially evaluated at Temple Physical Therapy on May 22, 2003. A patient referral form was completed on May 26, 2003, in which a "work hardening program" was requested. (Tr. 201-11, 213).

From May until August of 2003, plaintiff generally reported "no new complaints" with occasional reports of pain and soreness. The records demonstrated a "plateau in progress" (Tr. 215, 226-

14

27, 233-34, 237-39, 254, 222, 228, 270).

On August 7, 2003, plaintiff underwent a Functional/Work Capacity Evaluation at Temple Physical Therapy which found plaintiff had the ability to work in "the medium level category." (Tr. 270). However, plaintiff did not meet the requirements to return to "full duty" at that time.[19] (Tr. 260-70). Plaintiff indicated pain as a one (1) out of ten (10) before functional testing and a two (2) out of ten (10) after functional testing. (Tr. 260). Tests showed plaintiff demonstrated inappropriate illness behavior.[20] (Tr. 266). It was noted that "a medium work level is required," and specific restrictions were outlined which would allow plaintiff to "be most successful at returning to work if . . . met."[21] Plaintiff was discharged from Temple Physical

_____

[19] Further evaluation indicated plaintiff was able to exert up to fifty (50) pounds of force occasionally, twenty-five (25) pounds of force frequently, and negligible weight constantly. Plaintiff produced consistent maximum effort throughout testing. Physical examination showed plaintiff's shoulder range of motion to be slightly limited, painful and weak. (Tr. 270).

[20] Plaintiff scored positive indicators for Inappropriate Illness Behavior on four (4) of nine (9) subtests, indicating that an inappropriate illness behavior existed. Dr. Kelley defined inappropriate illness behavior as 'a behavior which is out of proportion to the impairment." (Tr. 266).

[21] Such restrictions included lifting from floor to knuckle limited to seventy-five (75) pounds; lifting from twelve inches (12") to knuckle limited to eighty-five (85) pounds; lifting from knuckle to waist limited to seventy (70) pounds; lifting from waist to shoulder limited to sixty-three (63) pounds; lifting from shoulder to overhead limited to sixty-three (63) pounds; push/pull activity limited to three hundred eighty-three (383) pounds; carrying unilaterally limited to eighty-six (86)

Therapy on August 14, 2003 by his physician, Dr. Kelley, who noted that plaintiff "has reached a plateau in progress towards goals, and has reached maximal work hardening benefit." (Tr. 271).

Plaintiff had an initial evaluation at Star Sports Therapy and Rehabilitation on January 11, 2005, for his chronic back pain. (Tr. 497). Plaintiff rated his pain a five (5) out of ten (10). (Tr. 497). Plaintiff attended physical therapy sessions at Star Sports Therapy and Rehabilitation approximately sixteen (16) times from January 11 until February 16, 2005. (Tr. 481-97). These physical therapy sessions were overseen by his physician, Dr. Kramer. (Tr. 497).

At his physical therapy session on January 18, 2005, plaintiff reported that his medications did not seem to be working. (Tr. 494). Plaintiff reported soreness in his back and legs on January 19. (Tr. 493). Plaintiff alleged right leg pain on January 26, and voiced no new complaints at his physical therapy session on January 28. (Tr. 489-90). Treatment notes reported no real change on February 1. (Tr. 488). On February 4, plaintiff attended his physical therapy session and reported, "I really think [my] back is getting better. Little by little." (Tr. 466). On February 8, 2005, plaintiff said "I'm really frustrated. This just doesn't seem to be helping too much. The

pounds; bilateral and front carries limited to one hundred sixty-one (161) and ninety-four (94) pounds, respectively. (Tr. 270).

therapy helps for only a short period of time and the pain comes back." (Tr. 485).  Plaintiff reported no new complaints at his physical therapy session on February 16. (Tr. 482).  Plaintiff was discharged from physical therapy per Dr. Kramer's orders on February 16, 2005. (Tr. 481).  The discharge report notes, "no appreciable gains at this time . . . [Plaintiff] has experienced no long term relief from his treatment.  Any relief was transient." (Tr. 481).

    4. <u>VA Hospital Medical Record</u>

Plaintiff received primary care treatment from the VA Hospital from January of 2002, until February of 2005. (Tr. 284-342, 352-450).  Plaintiff visited the VA Hospital approximately forty-two (42) times between January 11, 2002 and February 16, 2005. (Tr. 284-342, 352-450).

Treatment records from the VA Hospital from January 11 through June 28, 2002, document plaintiff's complaints of continued right shoulder discomfort.  Plaintiff reported pain radiating up the posterior neck and down the right arm, associated with numbness to finger tips on the right hand. Plaintiff was provided Percocet tablets for the pain. (Tr. 284, 286, 289, 291).  The VA Hospital medical records reveal that plaintiff was also taking Methocarbamol, Naproxen, and Triamcinolone Acetonide. (Tr. 286, 289, 291).

On June 28, 2002, plaintiff was unable to flex or abduct his

right shoulder greater than ninety (90) degrees, and complained of dropping objects in his hand. (Tr. 291).[22]

On his visit to the VA Hospital on September 26, 2002, plaintiff reported improved pain levels and rated his pain as a zero (0) out of ten (10). (Tr. 299). Plaintiff continued to use Naproxen bid, Methocrabamal bid-qid, and qhs Percocets to control the pain. (Tr. 299). Treatment notes show that plaintiff demonstrated shoulder abduction past ninety (90) degrees. (Tr. 300).

The VA Hospital medical records reveal that on January 15, 2003, plaintiff reported an increased pain level in his right shoulder which he rated as a six (6) out of ten (10). Plaintiff alleged a new onset of flank pain beginning within the past four (4) days. (Tr. 302). Plaintiff also reported plans for surgery on his right shoulder after learning of a small full thickness tear at the anterior aspect of the supraspinatus tendon from an MRI on September 24, 2002. (Tr. 302, 466, 467).

---

[22] Plaintiff was treated at the VA Hospital on July 24, 2002, for an unrelated incident, after being sprayed with pepper spray in his eyes and face. Plaintiff also suffered burning sensations on his hands, anterior thighs, testicles, and lateral canthus of left eye after police at the scene "flushed plaintiff's face with copious water which soaked plaintiff's chest, groin, testicles, and thighs." (Tr. 293) Plaintiff was seen again on June 25, and it was noted that plaintiff was "currently experiencing some mild irritation at the corner of his eyes." Plaintiff was advised to switch to Neutrogena soap and apply hydrocortisone cream, clotrimazole cream, and clotrimazole solution to affected areas sparingly. (Tr. 293-298).

Plaintiff was seen at the VA Hospital on February 25, 2003, for a pre-op evaluation in preparation for his scheduled rotator cuff repair surgery on his right shoulder. (Tr. 305).

The VA Hospital medical records reveal that on July 24, 2003, plaintiff was seen at the VA Hospital complaining of pain in his left shoulder with radiation to the bicep area. Plaintiff stated that the pain was progressing. (Tr. 310). Plaintiff was seen on September 8, 2003, with similar complaints of continued left shoulder pain. Treatment notes show that plaintiff also complained of increasing pain in his right shoulder associated with numbness in his right hand. Plaintiff rated the pain in his right shoulder a seven (7) out of ten (10) at the time of the visit.[23] (Tr. 315).

Three months later, on December 8, 2003, at the VA Hospital, plaintiff complained of exacerbation of chronic lower back pain and noted swelling in the past few months. Plaintiff stated that he was unable to stand or walk for more than five (5) minutes, had pain at rest, as well as pain in his lower left back. Plaintiff rated the pain as a four (4) out of ten (10) at the time of the visit. (Tr. 321).

On March 8, 2004, plaintiff was seen at the VA Hospital complaining of lower lumbar back pain with radiation of pain to his lateral right leg, down to his toes, associated with

---

[23] Treatment notes show that on December 4, 2003, plaintiff requested a refill for Percocet tablets. (Tr. 319).

numbness.  Plaintiff rated the pain as six (6) out of ten (10) at
the time of the visit.  Plaintiff was given Sulindac and
Methocrabamal, and his Nortiptline and Percocet medications were
increased. (Tr. 444-47, 435).  Plaintiff also underwent an MRI of
the lumbar spine on March 8, 2004.  "The lumbar spine films
[were] unremarkable.  There [are] some facet[24] changes at L5-S1 on
the right side." (Tr. 443).

On March 9, 2004, plaintiff had an orthopedic outpatient
consult at the Bone and Joint Center for a second opinion on the
outcome of his rotator cuff repair surgery.  Plaintiff was seen
by the orthopaedic resident, Dr. Gilbert R. Ortega, M.D., and the
attending, Dr. Michael J Medvecky, M.D. (Tr. 442).  Plaintiff
stated that his right shoulder "feels good" and that he had
minimal pain with activities.  (Tr. 440-41).  Plaintiff
complained of increasing pain in his left shoulder with mostly
overhead activities, as well as bilateral wrist pain, and finger
numbness.  Treatment plans were for plaintiff to undergo testing
to rule out median nerve compression syndrom with a nerve
conduction velocity test.  Dr. Medvecky referred plaintiff to
physical therapy for his left shoulder impingement syndrome. (Tr.
440-42).

On March 25, 2004, plaintiff was seen at the VA Hospital,
complaining of increased lower back pain.  Plaintiff was

---

[24]"Facet" is "a small smooth area on a bone or other firm
structure." Stedman's Medical Dictionary 556 (25th ed. 1990).

continued on Sulindac, Nortiptline Methocarbal,and Percocet. (Tr. 435-438). Treatment records from the VA Hospital note that on April 6, 2004, plaintiff was seen for an occupational therapy evaluation and told that he would benefit from six (6) to eight (8) sessions of "modalities, ROM, therex, education, HEP," and that his "rehab potential [was] good for stated goals." (Tr. 433). On April 9, 2004, plaintiff stated that, "I think the exercises are loosening up my shoulder." (Tr. 432).

On April 12, 2004, plaintiff's cervical spine films showed "mild degenerative changes at C6-7, otherwise essentially unremarkable. Overall the findings have remained unchanged from the previous study from September 8, 2003." (Tr. 426). A radiographic report for plaintiff's left shoulder from the same day showed "no evidence of acute fracture or dislocation in either the left or right shoulder joint. Bone anchors are again seen in the right humeral head that appear unchanged in the interval from the previous study." (Tr. 425). Plaintiff was seen at the VA Hospital that same day, complaining of pain in his right shoulder with rotation of his neck, numbness in his right hand down to his fingertips, occasionally dropping objects in his right hand, and pain in his left shoulder with abduction past ninety (90) degrees. Plaintiff rated the pain a two (2) to three (3) out of ten (10) in his neck. Plaintiff also noted depression, decreased motivation, irritability, and poor sleep

patterns. (Tr. 427).

From April 27 until June 4, 2004, plaintiff was seen at the VA Hospital five (5) times, mostly complaining that "my shoulder hurts when I lift it out [to] the side." (Tr. 416-18). Doctors noted that plaintiff was making progress towards his rehab goals, as seen with increased AROM [range of motion]." (Tr. 415-19). It was also noted that "plaintiff appears to have relief of shoulder pain following therapy . . . ." (Tr. 417-19).

On June 9, 2004, plaintiff underwent an MRI of the cervical spine to rule out stenosis or impingement. (Tr. 413, 421). The overall impression was of "multi-level degenerative disc disease worse at C4-5 and C5-6." (Tr. 413).[25]

On June 16, 2004, plaintiff was seen at the VA Hospital for Occupational Therapy. His provider noted that "patient tolerated

---

[25] The report findings stated; "There is a loss of disc height and T2 weighted seignal at C4-5, C5-6, and C6-7. The vertebral bodies demonstrate normal alignment and signal. At C2-3, mild posterior disc osteophyte complex causes mild narrowing of the left neural foramen and spinal canal. At C3-4, posterior disc osteophyte complex causes mild foraminal and spinal canal stenosis. At C4-5, the central and inferiorly extending posterior disc osteophyte complex causes mild neural foraminal narrowing bilaterally and moderately severe spinal canal stenosis. At C5-6, posterior disc osteophyte complex causes moderately severe spinal canal stenosis and moderate-to-severe neural foraminal stenosis, left greater than right. At C6-7, a mostly right-sided disc osteophyte complex causes severe neural foraminal narrowing on the right and mild neural foraminal narrowing on the left and moderate spinal canal stenosis. Although the spinal cord is deformed by the posterior disc osteophyte complexes at C4-5, C5-6, C6-7, there is no definite evidence for cord signal abnormalities. The paravertebral soft tissues are unremarkable." (Tr. 413).

well. [He] made nice progress towards rehab goals as seen with increased AROM." (Tr. 408). An Orthopedic Outpatient Progress Note from the next day, June 17, 2004, recorded that plaintiff had increasing pain in his left shoulder, mostly with overhead activities, and also complained of bilateral wrist pain and finger numbness. (Tr. 407). A Physical Therapy Consult from that same day noted that plaintiff received his initial injury to his lower back in 1995 and re-injured it three (3) times in 2001 while employed as a limo driver. The treatment note states that plaintiff's lower back would benefit from a course of therapy addressing exercises to reduce symptoms of pain. (Tr. 405).

Plaintiff attended physical therapy on June 22 and 29, 2004, for his chronic low back pain. Treatment notes state that, "[plaintiff] has a very sedentary lifestyle, and is not motivated to do Home Exercise Program independently. Will place a consult for wellness clinic for him to exercise in a group setting." (Tr. 390-91).

On August 16, 2004, plaintiff rated his back pain a five (5) to six (6) out of ten (10). It was noted that plaintiff had lost fifteen (15) pounds in the past three (3) months and had started a wellness clinic on August 12. (Tr. 386).

Plaintiff was seen at the VA Hospital again on September 23, 2004, concerning his left shoulder and back pain. He alleged that he was unable to extend his left shoulder beyond ninety (90)

23

degrees and has constant numbness in his hands as well as
increased back pain with weight bearing. (Tr. 383).

On December 3, 2004, plaintiff was seen at the VA Hospital
for a neurology consult. Neurological findings were largely
normal. (Tr. 380-81).

On January 10, 2005, plaintiff had an appointment at the VA
Hospital to discuss possible participation in the Compensated
Work Therapy Program. Plaintiff was told that his non-service-
connected("NSC") disability pension would be negatively impacted
by working competitively. (Tr. 376). Plaintiff attended a
Compensated Work Therapy ("CWT") intake on January 25, 2005. He
was advised that "if he worked competitively, his NSC pension
would be penalized dollar for dollar." (Tr. 372).

Plaintiff underwent a Health Psychology Consult on January
27, 2005, resulting in several recommendations.[26] (Tr. 367-71).

On January 31, 2005, plaintiff missed the Compensated Work
Therapy orientation and was unsure if he would attend the next
one as he "[was] evaluating the risk of working competitively

---

[26] They included that the plaintiff "be reinforced and
encouraged to follow through and engage in treatment with the
mental hygiene clinic. The [plaintiff] would benefit from
learning cognitive behavioral pain management coping strategies
from health psychology. This will aid the [plaintiff] in being
able to effectively self manage his pain. The [plaintiff] should
be encouraged to attend the MOVE program to assist him in
reducing his weight. PCP should consider consulting his pharmacy
in order to streamline the [plaintiff's] medication regimen to
increase adherence and reduce possible side-effects." (Tr. 370).

versus the penalty of possibly losing his NSC [pension]." (Tr. 365).

On February 3, 2005, Karen Marzitelli, APRN, of the VA Hospital stated that plaintiff was unable to extend his left shoulder beyond ninety (90) degrees, had constant numbness in his hands and fingertips and reported dropping objects such as keys and a remote control. Plaintiff's MS contin, sulindac, Percocet, and nortiptyline medications were continued. (Tr. 361).

On February 8, 2005, plaintiff attended a Mental Health Psychiatric Consult initial screening at the VA Hospital stating, "I want to take control of my life instead of letting anger and depression take over . . . ." (Tr. 357). Plaintiff reported that he had difficulty controlling his anger and had a lot of unresolved anger toward one of his brothers for "pawning" all of his parents belongings. (Tr. 357-58). Plaintiff reported a low energy level and a constant depressed mood. Plaintiff denied any suicidal or homicidal ideation. The consult note also states that:

> When asked about visual and auditory
> hallucinations Mr. Hoadley was somewhat
> guarded. He reported that he had an
> episode of "hearing trumpets" while at
> church. He also has heard his name
> being called several times. He
> hesitatingly denied having visual
> hallucinations. During the course of
> the interview with this writer he asked
> "are you tape recording me" when this
> writer's cell phone rang.

(Tr. 358).

It was recommended that the plaintiff undergo a more extended
psychiatric evaluation and that the plaintiff could benefit from
increased socialization. (Tr. 360).

On February 16, 2005, plaintiff was referred for a Mental
Health evaluation at the VA Hospital. (Tr. 354-56).  Plaintiff
reported feeling increasingly depressed over the past few years,
with increasing isolative behavior, low mood, low energy,
hyperphagia,[27] and bursts of anger resulting in the plaintiff
yelling at his mother and later regretting it.  Plaintiff stated
he felt worthless and isolated. (Tr. 354).  The treatment note
from this February 16, 2005, visit recorded that plaintiff had
heard intermittent voices and noises in the past, but described
those as isolated incidents. (Tr. 354).  Susan Kruger, M.D., and
Brittany Nguygen, M.D., wrote:

> Mr. Hoadley is a 48 [year old divorced
> white male] presenting with depressed
> mood and ongoing anger against brother
> for burglarizing their parents in 1997.
> [Plaintiff] feels he has become
> increasingly isolative and depressed
> over the past few years; also evidences
> some paranoia and mildly disorganized
> thoughts.  Agree with Dr. Salomy that he
> will need further evaluation for
> determining whether his is more
> appropriately diagnosed with MDD
> [Multiplex Developmental Disorder] with
> psychotic features versus
> schizoaffective disorder.  Also agree

---

[27]"Hyperphagia" is "gluttony; overeating." Stedman's Medical
Dictionary 743 (25th ed. 1990).

that cluster A personality traits may
also be contributing to paranoid
presentation.

(Tr. 356).

### 5. Medical Findings

On August 18, 1995, plaintiff had a CT scan of his lumbar
spine which showed a small central L4-5 disc herniation and a mild
L2-3 disc herniation.[28] (Tr. 342).  An MRI of plaintiff's lumbar
spine taken on August 25, 1995, showed a mild posterior disk bulge
at L3-4, mild spinal stenosis, and a mild posterior disk bulge at
L4-5 with minimal mass effect on the thecal sac. (Tr. 341).

On March 22, 1996, an MRI of plaintiff's lumbar spine showed
a L4-5 mild central disc protrusion/herniation which resulted in
mild central stenosis. (Tr. 339-40).

On February 11, 2000, plaintiff underwent an MRI of his left
shoulder which concluded that there was no evidence for rotator
cuff tear or tendinopathy.[29] (Tr. 128).

---

[28] The report also stated that "There is soft tissue density
extending superiorly and inferiorly from the disc space at this
level.  There is similar soft tissue extending superiorly and
inferiorly at the L3-4 level.  This soft tissue potentially may
represent herniated disc material.  A prominent lumbar venous
plexus is also possible . . . ." There was also a finding of
"prominent retroperitoneal soft tissues.  It is unclear whether
this is all bowel." (Tr. 342).

[29] The report stated that "Bone marrow signal is normal.
There is no significant joint effusion.  The rotator cuff is
intact, without evidence for tendinopathy or tear.  There is no
fluid within the subacromial or subdeltoid bursa.  A tiny
subchrondral cyst within the superolateral humeral head is noted.
The bicipital tendon is normally situated.  The gleniod labrum is

Plaintiff requested a disability determination for his left shoulder on June 16, 2000, from Dr. Pravda.  Dr. Pravda determined that plaintiff had "reached maximum medical improvement and had a 5% disability to his shoulder based off persistent and ongoing discomfort." (Tr. 131).

Plaintiff had a spine lumboosacral exam on November 20, 2000, which showed minimal degenerative changes with a tiny osteophyte protruding anteriorly from the L3 superior end plate. (Tr. 338).

On August 30, 2002, plaintiff was evaluated by Dr. Kelley for a second opinion regarding his right shoulder.  Dr. Kelley's impression was of "chronic signs and symptoms of rotator cuff inflammation with possibility for full thickness tear now that his symptoms have persisted for approximately 8 months." (Tr. 465).

An MRI of plaintiff's right shoulder from September 24, 2002, showed a small full thickness tear at anterior portion of insertion of supraspinatus tendon with "posterior fibers of supraspinatus appearing intact." (Tr. 466).

Plaintiff underwent a Functional/Work Capacity Evaluation by Temple Physical Therapy on August 7, 2003, which concluded that, "based upon the job description of a Limousine Driver in the Dictionary of Occupational Titles, a medium work level is required.  By this definition, William does meet the requirements

---

unremarkable." (Tr. 128).

to return to work at full duty in this capacity."[30] (Tr. 270)

On August 26, 2003, plaintiff was seen by Dr. Edward M. Staub, M.D., who noted that x-rays of the lumbar spine show some minimal degenerative changes. Dr. Staub determined that plaintiff had low back syndrome with right sciatica[31] and stated, "I don't feel that it is feasible for him to return to a similar type job . . . However, he would be suitable for any number of light or sedentary type jobs."[32] (Tr. 200).

On October 31, 2003, plaintiff had an MRI of his lumbar spine which found a central disc protrusion at L4-5.[33] (Tr. 272).

---

[30] The report also suggested the following restrictions/modifications: "lifting from floor to knuckle is limited to 75 pounds; lifting from 12" to knuckle is limited to 85 pounds; lifting from knuckle to waist is limited to 70 pounds; lifting from waist to shoulder to limited to 63 pounds; lifting from shoulder to overhead is limited to 63 pounds; push/pull activity is limited to 383 pounds; carrying unilaterally is limited to 86 pounds; bilateral and front carries are limited to 161 and 94 pounds, respectively." (Tr. 270).

[31] "Sciatica" is "pain in the lower back and hip radiating down the back of the thigh into the leg, usually due to herniated lumbar disk." Stedman's Medical Dictionary 1391 (25th ed. 1990).

[32] Dr. Staub's overall impression included, "I would predict that he does have a right-sided lumbar disc bulge, but he does not seem to be having enough trouble to warrant surgical intervention." (Tr. 200).

[33] Complete findings showed that T12-L1 is normal; L1-2 is normal; L2-3 shows degenerative vertebral spurring prevertebral, but no canal compression or neural foraminal compressions; L3-4 shows a minimal disc bulge but no significant compression of canal or neural foramen; L4-5 demonstrates a central disc protrusion with mild indentation of the thecal sac in midline, no evidence of compression of the lateral recess and no neural foraminal compression; L5-S1 is normal; The reformatted images show no evidence of a pars defect, the neural foramina are not

Plaintiff underwent a Residual Functional Capacity (RFC) Assessment by Dr. Arthur Waldman, M.D., a state agency physician, on December 16, 2003. (Tr. 273-279). Dr. Waldman concluded that plaintiff should be able to do sedentary work activities (though he could occasionally lift up to twenty (20) pounds) that did not involve repetitive use of the right shoulder.[34]

On January 12, 2004, plaintiff was seen by Dr. Kenneth M. Kramer, M.D., for a second opinion about his lower back problems. Dr. Kramer stated that his "recommendations are that he remain on light duty restrictions as it certainly does not appear feasible for him to return to heavy physical work in the foreseeable future."[35] (Tr. 281-83).

Plaintiff underwent a Physical Residual Capacity Assessment by Dr. Steven Paul Edelman, M.D., a state agency physician, on February 18, 2004. (Tr. 343-51). Dr. Edelman determined that plaintiff should be able to do light work that did not involve

_____

compressed. (Tr. 272).

   [34] The RFC assessment also noted that plaintiff could "occasionally lift and/or carry (including upward pulling) twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk (with normal breaks) for a total of at least two (2) hours in an eight (8) hour workday; sit (with normal breaks) for a total of about six (6) hours in an eight (8) hour workday; push and/or pull (including operation of hand and/or foot controls) limited in the upper extremities. (Tr. 274) (Handwriting is mostly illegible in this record.)

   [35] Dr. Kramer's impression was "of chronic lumbar strain, most likely with a disc component given the chronicity of the problem and radicular symptoms . . . ." (Tr. 282).

constant overhead lifting with his right arm.  The report

determined that plaintiff could occasionally lift and/or carry

(including upward pulling) twenty (20) pounds; frequently lift

and/or carry ten (10) pounds; stand and/or walk (with normal

breaks) for a total of about six (6) hours in an eight (8) hour

workday; sit (with normal breaks) for a total of about six (6)

hours in an eight (8) hour workday; push and/or pull (including

operation of hand and/or foot controls) unlimited, other than as

shown for lift and/or carry. (Tr. 344) It was also reported that

plaintiff could climb a ramp or stairs frequently, climb a

ladder/rope/scaffold occasionally; balance frequently, stoop

frequently, kneel frequently, crouch frequently, and crawl

occasionally. (Tr. 346).  Reaching in all directions was

determined to be limited "for only constant overhead work on the

right," handling (gross manipulation) was unlimited, fingering

(fine manipulation) was unlimited, and feeling (skin receptors)

was unlimited. (Tr. 347).[36]  Dr. Edelman determined that plaintiff

had chronic lower back pain with episodic exacerbations with out

significant persistent residua and "shoulder sx's s/p rotator cuff

repair."  He concluded that "light RFC [residual functional

capacity] is appropriate." (Tr. 349).

On March 8, 2004, plaintiff had an MRI of his lumbar spine.

The findings were overall unremarkable, with some facet changes at

_____

[36] No visual, communicative, or environmental limitations
were established. (Tr. 347-48).

L5-S1 on the right side. (Tr. 443).

Plaintiff was examined by Dr. Staub on May 29, 2004, for the purpose of an Independent Medical Examination ("IME") at the request of Attorney Edward M. Gillis. (Tr. 460-62). Dr. Staub stated that, having treated plaintiff for the past summer and fall "in regard to IME standards, I am not entirely *independent*, as I have already treated Mr. Hoadley . . . ." (Tr. 460). Dr. Staub also stated:

> I do feel that Mr. Hoadley's complaints are out of proportion to the rather unimpressive findings on the MRI and I do not rule out the possibility that there could be a functional or psychological component to this problem... In my opinion, [the plaintiff] does have a ten percent (10%) permanent impairment of the lumbar spine . . . I do not feel that it is feasible for him to return to the type of work that he did before. At this time I do not feel that he could do any work. However, if he is allowed to have treatment and does improve, then he would certainly be suitable for a light duty job with limited lifting in the future.

(Tr. 462).

Plaintiff underwent an MRI on June 9, 2004, which showed multi-level degenerative disc disease worse at C4-5 and C5-6. (Tr. 413).

Dr. Kramer told plaintiff on November 3, 2004, that:

> . . . without additional formal definitive or curative measures to be offered at this point in time, the situation [is] to be managed supportively, which should be done so

32

> with judicious non narcotic medications,
> maintenance of exercises taught to him
> at physical therapy, appropriate work
> restrictions which should consist of
> sedentary or light work on ten (10)
> pound lifting restriction with no
> repetitive lifting or bending.

(Tr. 458).

Dr. Kramer stated on the November 22, 2004, that "[the plaintiff] should remain permanently on his sedentary light work and look into Vocational Retraining . . . ." (Tr. 457).

6. Plaintiff's Hearing Testimony

A hearing was held on March 28, 2005, before ALJ Roy P. Liberman.  Plaintiff appeared in person and was represented by his attorney, Allan Rubenstein.

Plaintiff was forty-eight (48) years old at the time of the hearing.  Plaintiff has children and is divorced. (Tr. 524, 527). Plaintiff graduated from high school and lives with his mother. (Tr. 524-25).  Plaintiff testified that his mother helps him tremendously and that he could not survive on his own at this time without her. (Tr. 534).  Plaintiff has pain when driving distances longer than fifteen (15) miles and does not take a bus or train; he testified that his mother or a family member drives him. (Tr. 525).  Plaintiff also has trouble sleeping due to the pain, (Tr. 525), and trouble walking; he uses a cane when walking outside of the house but does not use it inside the house. (Tr. 534).

Plaintiff testified that at home he does the dishes, washes

33

the clothes, and sweeps the floors. His mother does the cooking. (Tr. 536). To pass the time plaintiff watches television, sits in a recliner chair, elevates his feet, and lays down. He also takes naps. (Tr. 534-35). Plaintiff testified that he spends most of the day either in the recliner with his feet elevated or laying down in bed. (Tr. 539). Plaintiff has trouble getting into the bath tub. He dresses himself, but does so slowly. (Tr. 535). Plaintiff testified that his hands get numb and tingly when he uses the computer keyboard. Plaintiff has less numbness when he keeps his hands near his body. (Tr. 540).

Plaintiff testified that he was a limousine driver for Connecticut Limousine from August 1990 to May 2002. (Tr. 526). Plaintiff had to move and handle the luggage. (Tr. 526-27). Plaintiff was a Correctional Officer in the State of Connecticut and also in the State of California prior to his job at Connecticut Limousine. (Tr. 527).

Plaintiff testified that was terminated from his job at Connecticut Limousine in May of 2002, due to a customer's complaint, and did not leave work because of his physical impairments. (Tr. 528). Plaintiff testified that he was "glad" he was terminated, and had prior thoughts of leaving because he was already having physical problems at the time, but was not planning on quitting the day he was terminated. (Tr. 530-31). Plaintiff testified that sometime after his termination he would have had to

leave his job because "it destroyed my body." (Tr. 531).

Plaintiff testified that he was diagnosed with chronic lumbar strain and has two (2) bulging discs. (Tr. 532). Plaintiff has numbness and tingling in both hands radiating down from the neck all the way to both arms. He has constant pain in his back. (Tr. 531). The pain radiates through his back down his right leg which gets numb and heavy and is like "walking with a cast on." (Tr. 532). Plaintiff testified that he cannot do any standard physical activity. (Tr. 531).

Plaintiff had surgery by Dr. Kelley on his right shoulder in March of 2003. (Tr. 531). Plaintiff testified that Dr. Kelley gave him a four percent (4%) disability rating of his right shoulder. (Tr. 532). Plaintiff takes Oxycodone, morphine, Tripoline, Methacarbonal and Somar every day for pain. Plaintiff testified that the pain medications help take the edge of the pain. (Tr. 533). He also does physical therapy exercises at home. (Tr. 533-34).

Plaintiff stated that he is seen by Dr. Pravda for his left shoulder, by Dr. Kelley for his right shoulder, by Dr. Kramer, Dr. Staub, and Dr. Luken at the U-Conn Medical Center for his back, and by Karen Marcetelli at the VA Hospital. (Tr. 538).

Plaintiff attends group pain management classes at the VA Hospital. (Tr. 540). He has received injections for pain management from Dr. Kramer in his back. (Tr. 540-41).

Plaintiff testified that he started seeing a psychiatrist at the VA Hospital for depression about a month or a month and a half before the ALJ hearing.  Plaintiff stated that he doesn't "feel productive, I don't feel like I have a life." (Tr. 542).

Plaintiff testified that he receives a VA pension of eight hundred forty-six ($846) dollars a month. (Tr. 536).  Plaintiff stated that the pension is not service-related and that he has "non-service-connected disabilities." (Tr. 536-37).

7. <u>Disability and the Standard of Review</u>

To be eligible for supplemental security income, Mr. Hoadley must establish that he suffers from a disability within the meaning of the Social Security Act. The Act defines "disability" as an inability to engage in substantial gainful activity by reason of a medically determinable impairment that can be expected to cause death or to last for twelve continuous months. 42 U.S.C. §1382c(a)(3)(A). Mr. Hoadley was disabled if his impairments were of such severity that he was unable to perform work that he had previously done and if, based on his age, education, and work experience, he could not engage in any other kind of substantial gainful work existing in the national economy.  42 U.S.C. §1382c(a)(3)(B).

This standard is a stringent one. The Act does not contemplate degrees of disability or allow for an award based on partial disability.  <u>Stephens v. Heckler</u>, 766 F.2d 284, 285 (7th

Cir. 1985). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1).

With regard to his claim for a period of disability and disability insurance benefits, the ALJ found that Mr. Hoadley met the nondisability requirements set forth in Section 216(I) of the Social Security Act and was insured for disability benefits through the date of the decision (Tr. 19).

In evaluating Mr. Hoadley's case, the ALJ followed the familiar five-step analysis, set forth in 20 C.F.R. §416.920, to determine whether plaintiff was disabled under the Social Security Act. The steps are as follows:

(1) Is the claimant engaging in substantial gainful activity? 20 C.F.R. §§416.910(b), 416.972(b).  If so, he or she is not disabled. 20 C.F.R. §416.920(b).

(2) If not, does the claimant have an impairment or combination of impairments that are severe? If not, he or she is not disabled. 20 C.F.R. §416.920(c).

(3) If so, does the impairment(s) meet or equal a listed impairment (the "Listings"), in the appendix to the regulations? If so, the claimant is presumed disabled without further inquiry. 20 C.F.R. §416.920(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987);

37

<u>Balsamo v. Chater</u>, 142 F.3d at 79-80.

(4) If not, can the claimant do his or her past relevant work? If so, he or she is not disabled. 20 C.F.R. §416.920(e).

(5) If not, can the claimant perform other work given his or her residual functional capacity, age, education, and experience? If so, then he or she is not disabled. A claimant is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. <u>See</u> 20 C.F.R. §416.920(f).

When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step, if the analysis proceeds that far. <u>Balsamo v. Chater</u>, 142 F.3d 75, 80 (2d Cir. 1998) (citing cases).

At step one, the ALJ found that Mr. Hoadley "has not engaged in any substantial gainful activity since May 12, 2003," the date of Mr. Hoadley's alleged onset, and the date his employment was terminated. (Tr. 19, 528). The ALJ further noted that, "the claimant admitted that he did not stop working on the alleged onset date for medical reasons. When asked how long he could have continued to work, he did not give a specific date and asked the undersigned to believe that he would have stopped working soon thereafter in any case." (Tr. 18)

At step two, the ALJ found that Mr. Hoadley's "cervical and lumbar strains with multi-level degenerative disk disease and possible right rotator cuff injury" are impairments that are

"severe" within the meaning of the Regulations.[37] (Tr. 19).

At step three, the ALJ found that Mr. Hoadley's impairments did not meet or equal a listed impairment in the appendix to the regulations. "The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. 19).

The ALJ then assessed Mr. Hoadley's residual functional capacity as required in step four. The ALJ found plaintiff retained the following residual functional capacity:

> To perform a full range of sedentary work,
> including sitting for six (6) hours and
> standing and walking for two (2) hours in an
> eight (8) hour day, and lifting and carrying
> up to ten (10) pounds.

(Tr. 19).

The ALJ further noted that

> the thrust of treating physicians opinions
> seems to be that he can do a full range of
> sedentary work. This was Dr. Staub's opinion
> in late 2003 (Exhibit 6F), although Dr. Staub
> had a more restrictive opinion as a non-
> treating physician in early 2004 (Exhibit
> 16F). The opinions of Dr. Kramer, a treating
> orthopedist , indicate a capacity at the
> minimum, sedentary work, despite an apparent
> short term opinion as to an inability to work.
> (Compare Exhibits 10F, 15F, 19F). In
> addition, state agency medical consultants
> concluded the claimant could do at least
> sedentary work, as noted earlier, and their
> opinions appear to be completely consistent

---

[37] The determination at step two as to whether an impairment is "severe" under the regulations is a <u>de miniumus</u> test, intended to weed out clearly unmeritorious claims at an early stage. <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 153 (1987).

> with the claimant's impairments and the
> overall opinions of treating and examining
> physicians.

(Tr. 19).

The ALJ found that "the claimant's assertions concerning his

ability to do work are not fully credible." (Tr. 19).

> First of all, as noted earlier, the claimant
> admitted that he did not stop working on the
> alleged onset date for medical reasons. When
> asked how long he could have continued work,
> he did not give a specific date and asked the
> undersigned to believe that he would have
> stopped working soon thereafter in any case.
> Further, the record indicates that when
> scheduled for surgery the claimant missed his
> appointment, thus suggesting the possibility
> that his back complaints may not have been as
> severe as alleged. Looking at the medical
> record as a whole, it appears that the
> claimant has pain primarily in his right
> shoulder with some discomfort bilaterally and
> that he experiences some back pain.  However,
> the thrust of treating physician opinions
> seems to be that he can do a full range of
> sedentary work . . .
>
> The claimant testified to severe limitations
> on functioning and difficulty with side
> effects, including drowsiness from
> medications, but I could find little or no
> reference to such complaints in the medical
> record.

(Tr. 17-18).

The ALJ noted that "the claimant clearly cannot return to his

past relevant work as a limousine driver which required lifting

luggage beyond his capacity.  He also cannot work as a corrections

officer due to the physical requirements of that job."  (Tr. 18).

Therefore, the ALJ found that "the claimant is unable to perform

the requirements of his past relevant work as limousine driver and corrections officer." (Tr. 19).

At step five, the ALJ found that

> As the claimant has demonstrated that he lacks the residual capacity to perform the requirements of any past relevant work, the burden shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medically determinable impairments, functional limitations, age, education, and work experience.  This determination is made in conjunction with the medical-vocational guidelines of Appendix 2 of Subpart P of the regulations (20 CFR Part 404).  Appendix contains a series of rules that direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's age, education, work experience, and residual functional capacity.  Born August 9, 1956, the claimant was age 45 (nearing 46) on the alleged onset date.  For the purpose of this decision, he is considered to be a younger individual age 45-49.  He has a high school education and has a semi-skilled work background, but  transferability of skills is not material in light of his age category.  The Medical-Vocational guidelines in Appendix 2, Subpart P, Regulations No. 4 provide determinations of whether or not a claimant is disabled under the Act, when the facts meet those criteria.  In this case, Rule 201.21 of Appendix 2, Subpart P, Regulations No. 4 applies and indicated that the claimant is able to make an occupational adjustment to other jobs existing in significant numbers in the national economy.

(Tr. 18-19).

To summarize, the ALJ found,

1.  The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits as of the established onset date and through December 31, 2007.
2.  The claimant has not engaged in substantial gainful

activity since May 12, 2003.

3.  The medical evidence established that the claimant has the following "severe" impairment: cervical and lumbar strains with multi-level degenerative disk disease and possible right rotator cuff injury.
4.  The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.
5.  The claimant's assertions concerning his ability to work are not fully credible.
6.  The claimant retains the residual functional capacity to perform a full range of sedentary work, including sitting for 6 hours and standing and walking for 2 hours in an 8-hour day, and lifting and carrying up to 10 pounds.
7.  The claimant is unable to perform the requirements of his past relevant work as limousine driver and corrections officer.
8.  On May 12, 2002, the claimant was a younger individual age 45-49.
9.  The claimant has a high school education.
10. The claimant has a semi-skilled work background but transferability of work skills is not material in light of his age category.
11. The claimant can make an occupational adjustment to other work that exists in significant numbers in the national economy under the provisions of Rule 201.21, Table No. 1, Appendix 2, Subpart P, Regulations No. 4.
12. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 19).


C. STANDARD OF REVIEW

Plaintiff brings this action to review a final decision of the Commissioner of Social Security under 42 U.S.C. §405(g). That section reads, in pertinent part,

The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of

> Social Security as to any fact, if supported by
> substantial evidence, shall be conclusive.

42 U.S.C. §405(g).

The scope of review of a social security disability determination involves two levels of inquiry. The Court must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the Court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).

Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v, Apfel, 145 F.3d 106, 110 (2d Cir. 1998). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).

The Court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). The Court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. Furthermore, "'[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk

that a claimant will be deprived of the right to have [his] disability determination made according to correct legal principles.'" Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) (quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).

D. DISCUSSION

Plaintiff claims that the ALJ made four crucial errors in finding that plaintiff is not entitled to a period of disability, disability insurance benefits, or Supplemental Security Income payments under §§ 216(I), 223, 1602, and 1614(a)(3)(A) of the Social Security Act.  Plaintiff claims that the ALJ (1) failed to apply the correct definition of sedentary work, (2) failed to follow the law and Social Security Rulings when making his findings of residual functional capacity, (3) disregarded non-exertional impairments that required the testimony of a vocational expert, and (4) failed to consider a very severe mental impairment.  As a result of these alleged errors, plaintiff seeks an order reversing the Commissioner's decision and awarding benefits or, in the alternative, an order remanding the case to the Commissioner for a new hearing.

The Commissioner contends that the ALJ's finding that plaintiff could do sedentary work was amply supported by the medical opinion of state agency medical reviewers and a number of treating physicians.  The Commissioner contends that, by considering all of the medical opinions in the record, the ALJ correctly determined that plaintiff was able to perform sedentary

work.  The Commissioner argues that there was a substantial
showing that plaintiff could possibly lift the ten pounds required
for sedentary work with his right arm, and no evidence that
plaintiff could not lift the required amount with his left hand.
The Commissioner further contends that there is no evidence in the
record that plaintiff cannot use his hands due to numbness.
Finally, the Commissioner asserts that because plaintiff made no
claim of mental difficulties in any of his reports to the SSA and
because there is very minimal mention in the record of such mental
problems, that the ALJ was correct in dismissing this claim.

1. <u>ALJ's Definition of Sedentary Work</u>

Plaintiff contends that the Commissioner applied the
incorrect definition of sedentary work.  Sedentary work is defined
in 20 C.F.R. § 220.132, which reads, in pertinent part:

> Sedentary work involves lifting no more than 10 pounds
> at a time and occasionally lifting or carrying articles
> like docket files, ledgers, and small tools. Although a
> sedentary job is defined as one which involves sitting,
> a certain amount of walking and standing is often
> necessary in carrying out job duties. Jobs are
> sedentary if walking and standing are required
> occasionally and the other sedentary criteria are met.

20 C.F.R. § 220.132.

The ALJ writes in his summary findings that sedentary work
includes "sitting for six hours and standing and walking for two
hours in an eight-hour day, and lifting and carrying up to ten
pounds."  (Tr. 19).  However, rather than defining sedentary work
in this section of the opinion, the ALJ is restating his

conclusion and his earlier findings regarding plaintiff's
capacity to sit, stand, walk, and plaintiff's ability to lift.

The record supports this finding. The ALJ's explanation of
sedentary work is consistent with Dr. Waldman's Residual
Functional Capacity Assessment from December 16, 2003. (Tr.
274). That assessment form required Dr. Waldman to check boxes
with varying ranges of pounds plaintiff could lift and hours
plaintiff could stand or walk. (Tr. 274). The Court finds it
reasonable, then, that the ALJ used the ranges given on the
assessment form to explain the rationale behind his finding that
plaintiff could in fact perform sedentary work.

2. ALJ's Findings on Residual Functional Capacity

Plaintiff argues that the Commissioner improperly
applied the Medical-Vocational Guidelines in determining
plaintiff's ability to work. Plaintiff contends that the
Commissioner failed to meet his burden of proof and that there is
substantial evidence in the record to support a disability
finding. [Doc. #10-2 at 22].

The Commissioner argues that the ALJ relied on the Medical-
Vocational Guidelines. The ALJ specifically cited Rule 201.26,
20 C.F.R. Part 404, Subpart P, Appendix 2 (2005). [Doc. #16-2 at
6].[38] Furthermore, the Commissioner argues that, "[t]he ALJ's

---

[38] This evidence is supported by the ALJ's eleventh (11)
finding that, "the claimant can make an occupational adjustment
to other work that exists in significant numbers in the national
economy under the provisions of Rule 201.21, Table No.1, Appendix

finding that plaintiff could do sedentary work was supported by
the medical opinion of state agency medical reviewers, which were
consistent with those of a number of treating physicians. (Tr.
273-79 (Residual Functional Capacity (RFC) Assessment by state
agency physician, Dr. Arthur L. Waldman, M.D. from December 16,
2003); Tr. 343-50 (Residual Functional Capacity Assessment by Dr.
Steven Paul Edelman, M.D., on February 18, 2004); Tr. 133-34
(treatment notes from plaintiff's visit with Dr. Jeffrey T.
Pravda, M.D., on January 3, 2002, and January 17, 2002); Tr. 136
(treatment note from plaintiff's visit with Dr. Pravda on March
14, 2002); Tr. 475 (treatment note from plaintiff's visit with
Dr. Kelley on June 6, 2003); Tr. 477 (treatment note from
plaintiff's visit with Dr. Kelley on August 12, 2003); Tr. 504-05
(disposition slip written by Dr. Kramer on October 21, 2004).
After reviewing the record, the Court agrees.

The ALJ's finding that plaintiff can perform sedentary work
was supported by the medical opinion of plaintiff's treating
physicians.  The ALJ's opinion states that,

> the thrust of treating physician opinions seems to
> be that he can do a full range of sedentary work.
> This was Dr. Staub's opinion in late 2003 (Exhibit
> 6F), although Dr. Staub had a more restrictive
> opinion as a non-treating physician in early 2004
> (Exhibit 16F).  The opinions of Dr. Kramer, a
> treating orthopedist, indicate a capacity at the
> minimum, sedentary work, despite an apparent
> short-term opinion as to an inability to work
> (Compare Exhibits 10F, 15F, 19F).  In addition,

2, Subpart P, Regulations No.4." (Tr. 19).

> state agency medical consultants concluded that
> the claimant could do at least sedentary work, as
> noted earlier, and their opinions appear to be
> completely consistent with claimant's impairments
> and the overall opinions of treating and examining
> physicians.

(Tr. 18).

The record supports the ALJ's conclusion. Dr. Staub's medical report from August 26, 2003 states, "[plaintiff] would be suitable for any number of light or sedentary type jobs." (Tr. 200). Dr. Kramer's medical records from January 12, 2004 state, "my recommendations are that he [plaintiff] remain on light duty restrictions as it certainly does not appear feasible for him to return to heavy physical work in the foreseeable future" (Tr. 455); from November 22, 2004, that "[plaintiff] should remain permanently on his sedentary light work" (Tr. 457); from October 21, 2004 state "light duty . . . 5 lb. lifting . . . no repetitive lifting or bending . . . sedentary work." (Tr. 504); and from February 17, 2005, state that, "[plaintiff] will need to remain on his sedentary/light restrictions" (Tr. 454). Dr. Waldman's RCF Assessment on December 16, 2003, states that plaintiff can occasionally lift and/or carry twenty (20) pounds, can frequently lift and/or carry ten (10) pounds, can stand and/or walk for at least two (2) hours in an eight (8) hour day, and can sit for about six (6) hours in an eight (8) hour day). (Tr. 274). Dr. Edelman's RCF Assessment on February 18, 2004, states that plaintiff can

occasionally lift and/or carry twenty (20) pounds, can

frequently lift and/or carry ten (10) pounds, can stand and/or

walk for about six (6) hours in an eight (8) hour day, and can

sit for about six (6) hours in an eight (8) hour day. (Tr.

344). Dr. Pravda's progress notes from March 14, 2002, state

that, "I am going to release [plaintiff] to full duty"). (Tr.

136). Dr. Kelley on August 12, 2003, states that he will

"release [plaintiff] to full duty of what his job was at the

time he was injured". (Tr. 477).

Theses opinions amount to substantial evidence as they

represented a reasonable reading of the relevant medical

evidence in the record, as the Commissioner argues. [Doc. #16-2

at 6].

### 3. ALJ's Disregard of Nonexertional Impairments Including Mental Impairments that Required a Vocational Expert

Plaintiff further argues that, "[w]here there is evidence

of non-exertional impairments, . . . a bilateral dexterity

impairment and a mental impairment, the burden can only be met

with the testimony of a vocational expert (or similar

evidence)." Rosa v. Callahan, 168 F.3d 82 (2d Cir. 1999) (citing

Bapp v. Bowen, 802 F.2d 601, 605-606 (2d Cir. 1986)); 20 C.F.R.

§404.1545(d). [Doc. #10-2 at 21]. The ALJ addressed plaintiff's

alleged non-exertional impairments in his decision by observing

that,

> [t]he claimant testified to severe
> limitations on functioning and difficulty

49

with side effects, including drowsiness from
medications, but I could find little or no
reference to such complaints in the medical
record. The overall record indicates that
the claimant should avoid overhead work and
lifting more than 15 pounds, but there is
nothing to indicate that he cannot sit for
six hours, walk for at least 2 hours in an 8
hour day, or lift and carry up to 10 pounds.

(Tr. 18).

The Court finds that the testimony of a vocational expert
was not needed because plaintiff's alleged non-exertional
impairments are not significant and are unsupported in the
record. In most situations, the Commissioner meets his burden at
the fifth step of the analysis by using the Medical-Vocational
Guidelines. Rosa, 168 F.3d at 78 (quoting Bapp, 802 F.2d at
604). However, "exclusive reliance on the grids is inappropriate
where the guidelines fail to describe the full extent of a
claimant's physical limitations." Rosa, 168 F.3d at 78. In
particular, "sole reliance on the [g]rid[s] may be precluded
where the claimant's exertional impairments are compounded by
significant nonexertional impairments that limit the range of
sedentary work that the claimant can perform." Zorilla v.
Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996). In these
circumstances, the Commissioner must introduce the testimony of a
vocational expert (or other similar evidence) that jobs exist in
the economy which claimant can obtain and perform." Rosa, 168
F.3d at 78 (quoting Bapp, 802 F.2d at 603).

"By the use of the phrase 'significantly diminish' we mean

the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp, 802 F.2d at 605-06.

Plaintiff first contends that the Commissioner failed to consider plaintiff's hand numbness as an additional nonexertional impairment. While the treatment records routinely record plaintiff's complaints of hand numbness and tingling (Tr. 132, 134, 291, 315, 361, 383, 427, 540), no treating physician has validated these symptoms. Indeed, plaintiff received no disability finding above 5% for shoulder-related complaints.[39]

Plaintiff also contends that Commissioner failed to consider plaintiff's mental health problems as a nonexertional impairment. The record indicates that in January 2005, plaintiff underwent a Health Psychology Consult that resulted in a recommendation that plaintiff obtain treatment at a mental hygiene clinic. (Tr. 367-71). Mental Health Psychiatric Consult notes from February 2005,

---

[39]On March 2, 2004, Dr. Kelley stated, "I think [plaintiff] has reached a maximum medical improvement . . . he is given a 4% permanent partial impairment of the upper extremity." (Tr. 480). On June 16, 2003, Dr. Pravda determined that plaintiff had reached maximum medical improvement and "[had] a five percent (5%) disability to his [left] shoulder based on persistent and ongoing discomfort."). (Tr. 131). On August 7, 2003, Dr. Kelley noted "inappropriate illness behavior." Plaintiff scored positive indicators for inappropriate illness behavior on four (4) of nine (9) subtests, indicating existence of an inappropriate illness behavior, which Dr. Kelley defined as "a behavior which is out of proportion to the impairment." (Tr. 266).

indicate that plaintiff had heard noises in the past; it was recommended that plaintiff undergo a more extended psychiatric evaluation and that he could benefit from increased socialization. (Tr. 358, 360). Following another psychological evaluation on February 16, 2005, Susan Kruger, M.D., and Brittany Nguygen, M.D., wrote that plaintiff presents a

> depressed mood and ongoing anger against
> brother for burglarizing their parents in
> 1997. [Plaintiff] feels he has become
> increasingly isolative and depressed over the
> past few years; also evidences some paranoia
> and mildly disorganized thoughts. Agree with
> Dr. Salomy that he will need further
> evaluation for determining whether his is
> more appropriately diagnosed with MMD
> [Multiplex Developmental Disorder] with
> psychotic features versus schizoaffective
> disorder. Also agree that cluster A
> personality traits may also be contributing
> to paranoid presentation.

(Tr. 356).

Although the record notes these mental health evaluations and consults, plaintiff did not make his claim for disability based on a mental illness. In order for plaintiff to meet the duration requirement of 20 C.F.R. §404.1509, plaintiff must show that the impairment "lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §404.1509. The Court agrees with the Commissioner that plaintiff has failed to provide substantial evidence in the record to meet this requirement.

Moreover, at plaintiff's hearing before the ALJ in March

2005, plaintiff had only been engaging in psychological evaluation/consults for one (1) to one and a half (1.5) months, and plaintiff placed no emphasis on a mental disability at that hearing. (Tr. 542). Indeed, the only three (3) mental health reports in the record are dated between January 27 and February 16, 2005, more than a year after plaintiff sought his hearing before the ALJ, and do not indicate that plaintiff was then in treatment. Rather, the most recent evaluation stated that further evaluation was necessary to reach a diagnosis.

Therefore, while plaintiff is not precluded from bringing a separate social security disability claim for his alleged mental illness, it was reasonable for the ALJ not to consider the mental impairment in this case because plaintiff failed to meet the duration requirement with regard to his alleged mental impairments.

D. CONCLUSION

For the reasons discussed above, plaintiff's Motion for an Order Reversing the Decision of the Commissioner **[Doc. # 10]** is **DENIED.** Defendant's Motion for Order Affirming the Decision of the Commissioner [**Doc. #16**] is **GRANTED.**

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of

this order. Failure to object within ten (10) days may preclude appellate review. <u>See</u> 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; <u>Small v. Secretary of H.H.S.</u>, 892 F.2d 15 (2d Cir. 1989)(per curiam); <u>F.D.I.C. v. Hillcrest Assoc.</u>, 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED at Bridgeport this 29th day of August 2007.


 /s/
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE